# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SHIRE LLC and
SHIRE US INC.,

                    Plaintiffs,                      Civil Action No. 1:15-cv-13909 (WGY)

          v.                                         Bench Trial

ABHAI, LLC,

                    Defendant.

## PLAINTIFFS' PRETRIAL BRIEF

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

BACKGROUND FACTS ................................................................................................. 2

ARGUMENT .................................................................................................................... 4

I.    Abhai's ANDA Product Infringes Claim 1 of the '096 Patent. ..................................... 4

    A.    Abhai's ANDA Product Has "one or more pharmaceutically active amphetamine salts that are covered with an enteric release coating." ................... 5

    B.    Abhai's ANDA Product Has an Enteric Release Coating that "provides for delayed pulsed enteric release." ................................................................................. 5

    C.    Abhai's ANDA Product Meets the "essentially all … within about 60 minutes" Limitation. ........................................................................................... 10

II.    Abhai's ANDA Product Infringes the '148 Patent. ...................................................... 10

    A.    Abhai's ANDA Product Meets the "delayed enteric release dosage form" Limitation. ........................................................................................................... 12

    B.    Abhai's ANDA Product Meets the "effective level" Limitation. ........................ 12

    C.    Abhai's ANDA Product Meets the "peak plasma concentration" Limitation. ........................................................................................................... 15

    D.    Abhai's ANDA Product Meets the AUC Limitation. .......................................... 20

    E.    Abhai's ANDA Product Meets the "about 22.5 to about 40 $C_{max}$" Limitation. ........................................................................................................... 23

    F.    Abhai's ANDA Product Meets the "about 40 $C_{max}$" Limitation. .......................... 24

    G.    Abhai's ANDA Product Meets the "coating thickness" Limitation. .................... 25

CONCLUSION .............................................................................................................. 25

i

## **TABLE OF AUTHORITIES**

Cases                                                                                    Page(s)

*Accent Pkg., Inc. v. Leggett & Platt, Inc.*,
    707 F.3d 1318 (Fed. Cir. 2013)...................................................................................18

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
    749 F.3d 1349 (Fed. Cir. 2014)...................................................................................11

*Broadcom Corp. v. Emulex Corp.*,
    732 F.3d 1325 (Fed. Cir. 2013)....................................................................................9

*Merck Sharp & Dohme Corp. v. Amneal Pharmaceuticals LLC*,
    __ F. Supp. 3d __, 2017 WL 399219 (D. Del. Jan. 30, 2017) ....................................9

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)...................................................................................20

## EXPLANATION OF CITATION FORMS

- "Shire" collectively refers to Plaintiffs Shire LLC and Shire US, Inc.

- "Abhai" refers to Defendant Abhai LLC.

- The "'096 Patent" refers to U.S. Reissued Patent No. RE42,096.

- The "'148 Patent" refers to U.S. Reissued Patent No. RE41,148.

- The "'300 Patent" refers to U.S. Patent No. 6,605,300.

- The "'819 Patent" refers to U.S. Patent No. 6,322,819.

- "Luk ¶__" refers to the opening expert report of Shen Yung Luk, Ph.D, dated October 21, 2016.

- "McGough Opening ¶__" refers to the opening expert report of James J. McGough, Ph.D., dated October 17, 2016.

- "McGough Rebuttal ¶__" refers to the rebuttal expert report of James J. McGough, Ph.D., dated December 15, 2016.

- "Dressman Opening ¶__" refers to the opening expert report of Jennifer Dressman, Ph.D., dated October 21, 2016.

- "Dressman Rebuttal ¶__" refers to the rebuttal expert report of Jennifer Dressman, Ph.D., dated December 16, 2016.

- "Maggio Opening ¶ __" refers to the opening expert report of John Maggio, Ph.D., dated October 21, 2016.

- "Maggio Rebuttal ¶ __" refers to the rebuttal expert report of John Maggio, Ph.D., dated December 16, 2016.

- "Bergstrom ¶ __" refers to the Expert Report of Abhai's expert, Richard F. Bergstrom, Ph.D., dated November 17, 2016.

- "Burgess Supplemental ¶__" refers to the Supplemental Expert Report of Diane Burgess, Ph.D., dated February 5, 2017.

- "Namburi Dep." refers to the 30(b)(6) Deposition Transcript of Ranga Namburi (October 14, 2016).

- "ANDA" refers to an Abbreviated New Drug Application.

- "Abhai's ANDA" refers to Abbreviated New Drug Application No. 207489.

- "ADHD" refers to "Attention Deficit Hyperactivity Disorder."

- "IR" refers to "immediate release."

- "DR" refers to "delayed release."

- "FDA" refers to the United States Food and Drug Administration.

- "USP" refers to United States Pharmacopeia.

- "Orange Book" refers to the FDA publication *Approved Drug Products with Therapeutic Equivalents.*

- "PTO" refers to the United States Patent and Trademark Office.

- "AUC" refers to "area under the curve," a pharmacokinetic parameter that measures the drug that is available to produce the desired biological effect.

- "$C_{max}$" refers to "maximum concentration," a pharmacokinetic parameter that corresponds to the highest concentration of drug in the plasma over the entire period of time during which measurements are taken.

- "POSA" refers to a "person of ordinary skill in the relevant art."

- "Claim Construction Statement" refers to the parties' Amended Joint Claim Construction Statement, Exhibit A (D.I. 77).

- "*Markman* Hearing Tr." refers to *Markman* Hearing Tr., Civ. A. No. 1:15-cv-13909-WGY (Sept. 20, 2016) (D.I. 80).

- "PFF" refers to Plaintiffs' Proposed Findings of Fact and Conclusions of Law.

## INTRODUCTION

ADHD—a disorder characterized by inattention, hyperactivity, and impulsiveness—is the most commonly diagnosed psychiatric disorder in children and a common disorder in adults. Prior to the development efforts that led to the '096 and '148 Patents, amphetamine-based ADHD treatments were immediate-release formulations; these formulations forced patients to take multiple doses over the course of the day, leading to stigmatization, poor compliance, and diversion. The Shire inventors addressed these problems, resulting in ADDERALL XR®, a once-a-day extended release amphetamine formulation.

Abhai seeks approval to market its generic version of ADDERALL XR before the expiration of the patents-in-suit. If approved and marketed, Abhai's ANDA Product will infringe Claim 1 of the '096 Patent and Claims 1, 11, and 13 of the '148 Patent, which collectively cover pharmaceutical compositions with a specific drug release patterns suitable for effective once-a-day ADHD treatment. The evidence demonstrating infringement comes largely from Abhai's own ANDA, which establishes that the ANDA Product is not only bioequivalent to ADDERALL XR, but also provides the claimed release profiles, and meets each and every claimed pharmacokinetic parameter.

Abhai's noninfringement defenses are without merit. *First*, Abhai's argument that the delayed release from its ANDA Product is too slow to satisfy the "release" limitations of the asserted claims rests on an erroneous interpretation of the claims (one that Abhai did not seek during claim construction) that conflicts with, and would render meaningless, another claim limitation, and ignores one of the Figures of the Patents that the Court already found is a claimed embodiment. When the ANDA Product is considered in the context of pharmaceutical science and in light of the patent specifications, the evidence will show that its delayed release is "rapid and complete" and meets all of the release limitations of the asserted claims. *Second*, Abhai's

1

argument that its own "once-daily" product is not effective for 8 hours is belied by statements and clinical trials cited in its own proposed label, bioequivalence data for its ANDA Product that it has already submitted to FDA, and a prior publication of its own expert. *Third*, Abhai's assertion that its ANDA Product does not meet the "peak plasma concentration" limitation is inconsistent with basic principles of pharmacokinetics as well as the patent and prosecution history. *Fourth*, Abhai's argument that administration of its ANDA Product does not produce a plasma concentration versus time curve with specified values for area under the curve (AUC) and maximum concentration ($C_{max}$) conflicts with the bioequivalence studies that Abhai performed and submitted to FDA in support of its ANDA.

Shire will establish infringement by at least a preponderance of the evidence, and judgment therefore should be entered in its favor.

## BACKGROUND FACTS

**The '096 Patent.** The '096 Patent is a reissue of the '819 Patent, and describes and claims modified-release mixed amphetamine salt formulations with a specific dual pulsed release suitable for effective once-a-day ADHD treatment. (*See* PFF ¶ 12.) Claim 1 of the '096 Patent is directed to a composition containing two components: (i) mixed amphetamine salts covered with an immediate release coating that provide immediate release of drug, and (ii) mixed amphetamine salts covered with an enteric release coating that provides a delayed pulsed enteric release of drug, in which "essentially all" of that drug is released within about 60 minutes after initiation of the enteric release. (*See* PFF ¶¶ 64−65.)

**The '148 Patent.** The '148 Patent is a reissue of the '300 Patent, and describes and claims modified-release mixed amphetamine salt formulations effective to deliver once-daily treatment for ADHD. (*See* PFF ¶ 18.) Claims 1, 11, and 13 of the '148 Patent recite pharmaceutical formulations comprising an immediate release dosage form that provides

immediate release upon oral administration, and a delayed enteric release dosage form that provides delayed release upon oral administration. (*See* PFF ¶¶ 188−199.) Unlike Claim 1 of the '096 Patent, Claims 1, 11, and 13 do not require that essentially all of the delayed enteric release occur within about 60 minutes.

These claims additionally recite certain features that Claim 1 of the '096 Patent does not. For example, they require that the formulations provide an "effective level of amphetamine base salts in the patient over the course of at least 8 hours," and that the peak plasma concentration produced by the delayed enteric release exceed the peak plasma concentration produced by the immediate release. (*See* PFF ¶ 193.) Claim 1 additionally requires that administration of the formulations produce a plasma concentration versus time curve with specific pharmacokinetic parameters, and Claims 11(as it depends from Claim 10) and 13 (as it depends from Claim 12) requires an enteric coating that is at least 25 µm thick. (*See* PFF ¶¶ 193, 198−199.)

**Abhai's ANDA Product.** Abhai has filed an ANDA seeking approval to sell a generic version of ADDERALL XR. Abhai's ANDA Product contains the same mixed amphetamine salts as ADDERALL XR, and is described as bioequivalent to ADDERALL XR "under fasted, fed, and fasted sprinkle conditions." (*See* Trial Ex. 26, 32; *see also* PFF ¶¶ 46, 50, 221.) Abhai's proposed label for its product also provides that, like ADDERALL XR, the product should be taken "once daily," and that the efficacy of the product—"in both morning and afternoon assessments"—has been demonstrated in ADHD patients taking it "once daily in the morning." (*See* Trial Ex. 31 at 2, 29–30; PFF ¶¶ 212−213, 219.)

Like ADDERALL XR, Abhai's ANDA Product is a capsule for oral administration. *See generally* Trial Ex. 31 at 2, 29–30; PFF ¶ 48. Abhai's ANDA capsule contains two populations of beads: "IR Beads" and "DR Beads." (*See, e.g.*, Trial Ex. 26 at 34; PFF ¶ 48−52.) Both types of beads are made up of sugar spheres (the "core particle") covered with a "drug layer," made up

of the four mixed amphetamine salts mixed with a binder. The DR Beads are then further coated by a "DR Polymer layer," which contains an enteric release polymer (Eudragit L30D-55). (*See id.*; PFF ¶¶ 49−52.)

Abhai's ANDA Product has five dosage strengths: 10 mg, 15 mg, 20 mg, 25 mg, and 30 mg. (*See* Trial Ex. 27 at 1–2; Trial Ex. 121 at 1–2; PFF ¶ 46.) For each dosage, half of the total dose is nominally in the IR Beads, and half is in the DR Beads. *See id.* Like ADDERALL XR, Abhai's ANDA capsules, which contain about equal amounts of IR and DR Beads, are "designed to give a double-pulsed delivery of amphetamines." (*See* Trial Ex. 31 at 24; *see also* PFF ¶ 50.) When Abhai's ANDA Product enters the stomach, the IR Beads release their drug contents quickly. In contrast, the DR Beads are designed to release their active ingredients later, once the higher pH of the intestines is encountered. (*See* PFF ¶¶ 120−122.)

## ARGUMENT

Shire will meet its burden at trial of establishing infringement of the asserted claims of both the '096 and '148 Patents by at least a preponderance of the evidence.

## I.    Abhai's ANDA Product Infringes Claim 1 of the '096 Patent.

Abhai only disputes that two limitations are not met by its ANDA Product: (1) "one or more pharmaceutically active amphetamine salts that are covered with an enteric release coating that provides for delayed pulsed enteric release" (sections A and B below); and (2) "wherein said enteric release coating releases essentially all of said one or more pharmaceutically active amphetamine salts coated with said enteric coating within about 60 minutes after initiation of said delayed pulsed enteric release" (the "essentially all … within about 60 minutes" limitation).

A.    **Abhai's ANDA Product Has "one or more pharmaceutically active amphetamine salts that are covered with an enteric release coating."**

Abhai's ANDA establishes that the DR Beads contained in Abhai's ANDA Product include "one or more pharmaceutically active amphetamine salts that are covered with an enteric release coating," as required by Claim 1 of the '096 Patent. (*See* Trial Ex. 1; PFF ¶¶ 68−89.) In particular, it states the DR Beads are "enteric coated" with Eudragit L30D-55, a polymer that Abhai's own corporate representative describes as an "enteric coating" that helps "protect the actives from release" in the stomach. (*See* Trial Ex. 26 at 38–39; *see also* Trial Ex. 32 at 22–23; Namburi Dep. at 114:6–15; PFF ¶¶ 72, 73, 76.) Abhai offers no evidence to dispute these facts.

B.    **Abhai's ANDA Product Has an Enteric Release Coating that "provides for delayed pulsed enteric release."**

The dissolution results reported by Abhai in its ANDA show that the enteric release coating in Abhai's ANDA Product "provides for delayed pulsed enteric release." (*See* PFF ¶¶ 90−167.) These results are bolstered by testing conducted by Dr. Shen Luk, and Abhai's proposed label, which observes that the ANDA Product is "designed to give a *double-pulsed delivery* of amphetamines" (an immediate and a delayed enteric pulse). (Trial Ex. 31 at 24 (emphasis added); *see also* PFF ¶¶ 168−176.)

The parties agreed that "delayed pulsed enteric release" means "rapid and complete release of drug (after a first dose by immediate release) designed to be delayed until the drug has passed through the stomach into the intestines." (D.I. 77 at A–1; *see also* PFF ¶ 90.) However, the parties disagree about what "rapid and complete" means. Interpreted within the context of the '096 Patent, "complete release" would be understood by a POSA to mean a release of 75–80% of the drug. *See* PFF ¶¶ 91−99. This is because, as both FDA and the U.S. Pharmacopeia—the organization responsible for setting standards for drug approval—have recognized, drug release testing may be stopped at 75–80%. (*See* Trial Ex. 5 at 10 ("Adequate sampling should be

performed . . . until either 80% of the drug from the drug product is released or an asymptote is reached."); Trial Ex. 19 at 8 ("Typical acceptance criteria for the amount of active ingredient dissolved, expressed as a percentage of the labeled content (Q), are in the range of 75% to 80%. A Q value in excess of 80% is not generally used, because allowance needs to be made for assay and content uniformity."); PFF ¶ 92−96.) These documents, one of which—the FDA guidance—was part of the prosecution history, set out the way in which a POSA would have understood the term "complete."

Based on a single passage in the specification, Abhai argues that "rapid and complete" requires the ***entire dose*** to be released in 30–60 minutes. But Abhai's interpretation of this term is inconsistent with the claim language, the remainder of the specification, and this Court's claim construction order. Claim 1 further specifies that "***essentially all***" of the enteric release must occur within "***about 60 minutes***." (PFF ¶ 109.) If a delayed pulsed enteric release required ***all*** of the dose to be released within ***30–60 minutes***, there would be no reason to further specify that essentially all of that dose is released within about 60 minutes. (PFF ¶ 111.) Abhai simply reads this language out of the claim. Moreover, Figure 6 of the '096 Patent—which the Patent describes as "exemplif[ying] the delayed release components of the present invention," and which the Court in its claim construction order acknowledged "supports [the] pulsed release invention in the '096 Patent"—depicts about 80% release over six hours, signifying that the term "rapid and complete" does not mean the total dose is released within 30–60 minutes:



6

(Trial Ex. 1 at Fig. 6, 6:49–53; D.I. 85 at 11–12; PFF ¶¶ 101−6, 112, 113.)

Using the proper yardstick for measuring whether release is "rapid and complete"—the benchmark of 75–80% for "complete" release that a POSA would understand from both the '096 Patent and the guidance provided by FDA and USP—it is clear that each and every dose of Abhai's ANDA Product exhibits "delayed pulsed enteric release." Abhai conducted dissolution testing in support of its product, employing the specific test FDA recommends for extended release mixed amphetamine salt formulations. (*See, e.g.*, Trial Ex. 9 at 3; PFF ¶ 123.) This dissolution test is universally recognized as providing a proxy for *in vivo* performance, with the dissolution stages mimicking the pH of the stomach and the upper small intestine. (*See id*.)

The dissolution testing reveals dual-pulsed release, with a first pulse (corresponding to the IR Beads) occurring in the first hour and a second pulse (corresponding to the DR Beads) occurring between the second and third hours. (*See* PFF ¶¶ 124−131.) Additionally, the dissolution testing shows *complete* release of the drug in the DR Beads occurring within one hour of introduction of intestinal pH. (*See* PFF ¶ 132.) When the data is "normalized" so that it reflects the actual content of the dosage forms—the ANDA permits the capsules to contain 90–110% of the label amount (PFF ¶ 154)[1]—the dissolution data for the initial ANDA batches shows release for four of five strengths exceeds 75% (all but the 30 mg strength) and three of five strengths are over 80% (all but the 20 and 30 mg strengths). (*See* PFF ¶¶ 156−159.)

Abhai conducted other testing to apply for a shelf life of two years. (*See* PFF ¶¶ 133−136.) If the requested shelf life is approved, the Abhai product will not "expire" until two years have passed since manufacture, and pharmacies can dispense and patients will be able to

---

[1]  As an example, a capsule for the 30 mg strength could contain anywhere from 27 mg (90%) to 33 mg (110%).

take Abhai product that is two years old or less. (*See id*.) This stability testing included dissolution testing conducted on each dosage strength at different sample ages: 3, 6, 9, 12, 18, and 24 months.[2] (PFF ¶¶ 137−139.) This data shows that for each dosage strength, at most sample ages, the release from the DR Beads exceeded 75% after one hour in the simulated intestinal fluid:

| Time Point | Normalized Percent Release | | | | |
|---|---|---|---|---|---|
| | 10 mg | 15 mg | 20 mg | 25 mg | 30 mg |
| Initial | 80.4% | 85.7% | 77.8% | 85.1% | 69.0% |
| 3 months | 79.2% | 92.2% | 75.6% | 78.3% | 66.7% |
| 6 months | 90.4% | 76.6% | 85.1% | 84.8% | 70.5% |
| 9 months | 92.6% | 85.7% | 89.4% | 78.3% | 87.0% |
| 12 months | 86.8% | 79.6% | 77.1% | 78.3% | 76.7% |
| 18 months | 88.2% | *96% | 85.1% | *98% | 84.4% |
| 24 months | *102% | N/A | *96% | N/A | *92% |
| Range | 79.2–102% | 76.6–96% | 75.6–96% | 78.3–98% | 66.7–92% |

(*See* Trial Ex. 130 at 43, 46 (10 mg); 50 (15 mg); 54–57 (20 mg); 60 (25 mg); 64–67 (30 mg); PFF ¶ 137.)[3] Specifically, for 30 of the 33 time points measured, release exceeded 75%; 20 of 33 time points exceeded 80%; and for at least one time point tested for each dosage strength, release exceeded 90%: 102% (10 mg), 96% (15 mg), 96% (20 mg), 98% (25 mg), and 92% (30 mg). (*See id.*). Abhai's expert relied on the same data, and although she calculated "normalized" release using a somewhat different methodology, her bottom-line results are indistinguishable from those depicted above: the majority of time points tested showed release exceeding 75%

---

[2]  Not all dosage strengths were tested at 24 months. (*See* Trial Ex. 130 at 43–46; PFF ¶¶ 138−139.)

[3]  Dissolution data after four hours of testing was not provided for all time points. For those time points, release between hours two and three was instead divided by 50 (as the capsules nominally contain 50% of the amphetamine in the DR Beads). These time points are denoted by *.

and, for at least one time point tested for each dosage strength, over 90% release. (Burgess Supplemental ¶¶ 3, 5.)

These results are further confirmed by dissolution testing performed on 20 mg and 30 mg samples of Abhai's ANDA Product by Shire's expert, Dr. Shen Yung Luk. (PFF ¶¶ 168−173.) For the 20 mg strength, he obtained 94.1%, and for the 30 mg strength, he obtained 95.1%, values strikingly in line with those obtained in the stability dissolution testing. (PFF ¶¶ 170.)

In response, Abhai can only quibble with some of the data points from its own ANDA and the age of the product samples Dr. Luk tested (which Abhai supplied after or near expiry). Thus, Abhai will argue that the 24-month dissolution testing—*the very testing Abhai is relying on to support its proposed 24-month shelf life before FDA*—should be disregarded because the dissolution testing was not conducted on the precise two-year anniversary of the samples' manufacture—but was instead conducted on samples that were a few weeks older than 24 months. Abhai also will argue that the Court should disregard Dr. Luk's dissolution testing, even though the results line up with the stability dissolution testing, indicating that the product had not degraded. These quibbles do not withstand scrutiny.

Nor is it of any moment that *some* of the data points show release of less than 75%: that is of course irrelevant, as Abhai will be selling its product, and patients will be taking that product, up to 24 months after manufacture. (*See Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("It is well settled that an accused device that sometimes, but not always, embodies a claim nonetheless infringes.").) Moreover, when courts have confronted analogous issues to those presented here—even where the ANDA was silent on the issue at hand—they have considered the relevant question to be whether the ANDA product will infringe at any point during its proposed shelf life. (*See, e.g.*, *Merck Sharp & Dohme Corp. v. Amneal Pharmaceuticals LLC*, __ F. Supp. 3d __, 2017 WL 399219, *1–3 (D. Del. Jan. 30, 2017) (in

determining whether claims directed to a particular polymorph (MFM) were infringed by ANDA product containing a related polymorph that allegedly would covert to the covered polymorph over time, "[t]he question for infringement is whether Amneal's ANDA product … contains any patented MFM during the product's two-year shelf-life.").) Here, of course, unlike the *Amneal* case, the ANDA itself provides evidence of infringement for at least one sample age of each and every dosage strength during the proposed two-year shelf life. For this reason, the ANDA itself is conclusive on the issue of infringement of the "delayed pulsed enteric release" limitation.

At the end of the day, unless the Court is persuaded that each and every molecule of drug in the DR Beads must be released within one hour of introduction to the intestinal pH—a conclusion that would be at odds with the claim language and the release profile shown in Figure 6—the ANDA clearly demonstrates "rapid and complete" release.

### C.  Abhai's ANDA Product Meets the "essentially all … within about 60 minutes" Limitation.

Abhai's ANDA Product also meets the "essentially all … within about 60 minutes" limitation based on the same data discussed above. As the ANDA Product shows *complete* release in 60 minutes, it necessarily shows that "essentially all" of the drug in the DR Beads has released within *about* 60 minutes. (PFF ¶¶ 177–187.)

## II.  Abhai's ANDA Product Infringes the '148 Patent.

Abhai disputes a number of limitations of the asserted claims of the '148 Patent: (1) the "delayed enteric release dosage form that provides delayed release upon oral administration" (the "delayed enteric release dosage form limitation"); (2) "sufficient to maintain an effective level of amphetamine base salts in the patient over the course of at least 8 hours without further administration of amphetamine base salts" (the "effective level limitation"); (3) "peak plasma concentration of amphetamine base salts reached after release of said delayed enteric release

dosage form" that "exceeds the peak plasma concentration previously reached after release of said immediate release dosage form" (the "peak plasma concentration limitation"); (4) "will produce in a human individual a plasma concentration versus time curve (ng/ml versus hours) having an area under the curve (AUC) of about 467 to about 714 ng hr/ml" (the "AUC limitation"); (5) "said plasma concentration curve has a maximum concentration ($C_{max}$) of about 22.5 to about 40 ng/ml for about total dose of 20 mg" (the "about 22.5 to about 40 $C_{max}$ limitation," Claim 11 only); (6) "wherein $C_{max}$ is about 40 ng/ml" (the "about 40 $C_{max}$ limitation," Claim 11 only); and (7) "wherein said thickness is at least 25 μm" (the "coating thickness limitation," Claims 11 and 13 only).

Most of the disputed limitations (all but (1) and (7) of the limitations listed above) can be resolved by rejecting Abhai's proposed constructions of "a human individual" and "a human patient." At *Markman*, the Court declined to construe these terms, which Abhai had asked the Court to construe. Abhai nevertheless has continued to argue that these limitations can only be met by a showing that a "population" (rather than a single "patient" or "individual") meets the limitation in question based on mean data or—in the case of the "effective level" limitation—other data representative of the likely performance of the ANDA Product in the precise population (including ethnicity and age) in which it will be prescribed. This argument rests entirely on a single case, *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349 (Fed. Cir. 2014), which the Federal Circuit expressly warned was limited to its facts. While the Court did construe "a patient" as "a patient population," (*id.* at 1353) the Court explicitly refrained from announcing a universally applicable construction: "***In view of the proper claim construction of 'clinically significant electrolyte shifts,***' the district court's application of the claim terms 'a patient' leads to the absurd result of infringement even if a composition causes clinically significant electrolyte shifts in a large percentage of patients." (*Id.* at 1357 (emphasis added).)

11

Here, there is no construction of another term that compels a construction of "a human individual" that would depart from the way "a" would normally be construed. Moreover, the *Braintree* court supported its construction by referring to the way "patient" was used in the specification. (*Id.*) Here, the '148 Patent specification provides pharmacokinetic data not from a patient population, but from two individual subjects. (*See infra* at 20; *see also* PFF ¶ 323.) The intrinsic evidence in this case, unlike that at issue in *Braintree*, compels construing the disputed term as referring to *a* (*i.e.*, one or more) single human, just as "a" is interpreted elsewhere. (*See* Trial Ex. 2 Figs. 7−8; Trial Ex. 179 at 281; *see also* PFF ¶¶ 348−350.)

## A. Abhai's ANDA Product Meets the "delayed enteric release dosage form" Limitation.

The "delayed enteric release dosage form" limitation was construed as "a dosage form that provides rapid and complete release of drug (after a first dose by immediate release) intended to be delayed until the drug has passed through the stomach into the intestines after oral administration." (D.I. 85 at 13; *see also* PFF ¶ 202.) Because this construction is nearly identical to the agreed-upon construction of the "delayed pulsed enteric release" limitation in Claim 1 of the '096 Patent, Abhai's ANDA Product meets the "delayed enteric release dosage form" limitation for the same reasons it meets the "delayed pulsed enteric release" element. (*See* Section I.B., *supra*; PFF ¶ 203–205.)

## B. Abhai's ANDA Product Meets the "effective level" Limitation.

Abhai has told FDA that Abhai's ANDA Product is bioequivalent to ADDERALL XR and will produce the "same therapeutic effect" in patients. (Trial Ex. 145 at 1; PFF ¶¶ 222−23.) For this reason, it is not surprising that ample evidence demonstrates that Abhai's ANDA Product satisfies the "effective level limitation." (*See, e.g.*, Trial Ex. 117 at 5–7, Figs. 1–2, Tbls. 3–4; Trial Ex. 31 at 8; Trial Ex. at 141 at 1003–04; PFF ¶¶ 206−278.)

Abhai's proposed label indicates that Abhai's ANDA Product—which Abhai repeatedly characterizes as an "extended release" capsule designed to be administered "once daily"—can replace immediate-release ADDERALL administered two to three times daily. (Trial Ex. 31 at 8; PFF ¶ 212−13.) Because the immediate-release ADDERALL dosing regimen has been found to reduce ADHD symptoms over the course of at least 8 hours (Trial Ex. 86 at 3–4, Tbls. 1–2; Trial Ex. 152 at 6) the statements in Abhai's proposed label tell patients, physicians, and regulators that Abhai's ANDA Product provides a similar reduction in ADHD symptoms over the same time frame. (PFF ¶ 212−219.)

That Abhai's ANDA Product meets the "effective level" limitation is also supported by the clinical studies cited in its proposed label, which support the widely held view that ADDERALL XR—and thus, by extension, Abhai's therapeutically equivalent ANDA Product—reduces ADHD symptoms over the course of at least 8 hours. (PFF ¶¶ 227−232.) The "McCracken study" measured ADDERALL XR's time-course of effect in 51 school-age children and reported a rapid onset of effect that continued up to 12 hours after administration.[4] (PFF ¶ 229.) The "Biederman study" similarly found that the effects of a morning dose of ADDERALL XR were as strong at 10 am as they were at 4 pm, and concluded that ADDERALL XR "lasts throughout the school day and into the early evening." (Trial Ex. 118 at 7–8; PFF ¶¶ 245−248.) Both the McCracken and Biederman studies were later cited for the proposition that ADDERALL XR reduces ADHD symptoms over the course of at least 8 hours.[5] (PFF

---

[4] *See, e.g.*, Trial Ex. 117 at 8 ("Analyses of the effects of [ADDERALL XR] 20 mg (equivalent to 10 mg of Adderall b.i.d.) and 30 mg (equivalent to 15 mg of Adderall b.i.d.) showed beneficial effects at the first postdose assessment (1.5 hours postdose) and maintenance of these improvements throughout 12 hours for the majority of assessments.").

[5] *See, e.g.*, Trial Ex. 140 at 2, 9, 11 (ADDERALL XR has "[a] rapid onset of action (within 1.5 h) and persistent therapeutic effect for up to 12 hr (through the school day into the early

¶¶ 230−233, 248.) While the other studies in Abhai's proposed label did not measure efficacy over a set number of hours, they also affirm the effectiveness of Abhai's ANDA Product as a once-daily treatment. (*See* Trial Ex. 31 at 29−30; *see also* PFF ¶ 249−250.) Moreover, the millions of prescriptions written for ADDERALL XR—to which Abhai claims therapeutic equivalence—testify to its effectiveness as a once-daily medication. (*See* PFF ¶ 242.)

Finally, pharmacokinetic data from Abhai's ANDA confirms that Abhai's ANDA Product is bioequivalent to ADDERALL XR and that the plasma concentration versus time curves of both products are nearly identical. (*See* Trial Exs. 68−71, 75, 82; Trial Ex. 145 at 1; PFF ¶¶ 265−278.) Like ADDERALL XR, Abhai's ANDA Product has a rapid onset of effect, and the maximum concentration of amphetamine ($T_{max}$) is reached in almost all patients at four hours or later. (*See* Trial Exs. 68–71, 75, 82; PFF ¶ 270.) Accordingly, like ADDERALL XR, Abhai's ANDA Product maintains efficacy for at least four hours after $T_{max}$—ensuring that efficacy will continue until at least 8 hours after administration. (*Compare* Trial Ex. 117 at 5–7, Figs. 1–2, Tbls. 3–4 *with* Trial Ex. 58 at 5; *see also* PFF ¶¶ 272−273) When administered with food, Abhai's ANDA Product generally will achieve $T_{max}$ after 8 hours, lengthening the duration of efficacy to at least 12 hours. (*See* Trial Exs. 69, 71.)

Despite this evidence, Abhai will apparently argue to this Court—but not to FDA—that its "once-daily" product is *not* effective over the course of the entire day. Abhai's primary argument—that the clinical trials cited in its own proposed label are irrelevant because they did not measure efficacy on the first day of administration, when no residual amphetamine was present in the subjects' blood—fails because it relies on a belated and fundamentally flawed

---

evening)."); Trial Ex. 141 at 4 ("[ADDERALL XR] has a rapid onset of action—within 1.5 h—and a persistent therapeutic effect, providing symptom control throughout the day and into the early evening.").

construction of the effective level limitation. The claims simply require that the formulation maintain an effective level for 8 hours without an additional dose during the *same* 8 hour period—*i.e.*, they require the formulation to serve as an effective once-daily ADHD treatment. (*See, e.g.*, Trial Ex. 2 at 13:42–45 (requiring the formulation to "maintain an effective level ... over the course of *at least 8 hours without **further** administration* of amphetamine salts") (emphasis added).) The '148 Patent nowhere assigns any special import to the first day of administration or to the absence of residual amphetamine in the blood. Moreover, far from requiring that the formulation be effective the first time it is administered, the claims suggest that efficacy may be measured subsequently, when residual amphetamine is present: they specifically speak of "maintain[ing]"—rather than creating—an effective level of amphetamine. Even if the Court were to credit Abhai's belated claim construction argument, the evidence generally demonstrates that the Abhai ANDA Product will be effective, and Abhai has pointed to no evidence that a different result would be obtained on the first day of administration.

Abhai's remaining arguments consist primarily of hyper-technical criticisms of the studies that Abhai itself relies upon in its proposed label as evidence that its "once-daily" ANDA Product will be effective. (Trial Ex. 31 at 29–31; PFF ¶¶ 233−243.) Abhai identifies no sources that cast doubt on the results of these clinical trials or on ADDERALL XR's success in reducing ADHD symptoms over the course of at least 8 hours. The only evidence Abhai can muster is the testimony of an expert witness who, before being retained in this case, wrote that ADDERALL XR's "typical duration of action" is 8–10 hours. (Trial Ex. 157 at 10, Table 5.)

C.    **Abhai's ANDA Product Meets the "peak plasma concentration" Limitation.**

The evidence will also show that Abhai's ANDA Product meets the "peak plasma concentration" limitation. That Abhai's ANDA Product meets this limitation is not surprising

given its formulation and the long half-life of its active ingredient, amphetamine. (*See* PFF ¶¶ 282.)

As explained above, Abhai's ANDA Product consists of IR Beads and DR Beads, with the dosage split evenly between the two beads. (*See supra* at 4; PFF ¶ 283.) After administration, the drug in the immediate release dosage form will release, dissolve, and begin to be absorbed into the blood plasma, until the concentration of amphetamine in the plasma reaches a "peak plasma concentration" "after release of [the] immediate release dosage form." (Trial Ex. 2; PFF ¶ 284.) After release of the immediate-release drug, the delayed enteric release dosage form enters the small intestines and its drug releases, dissolves, and begins to be absorbed into the plasma. (Maggio Opening ¶¶ 48–50, 118–20; PFF ¶¶ 284−285.) Because the half-life of amphetamine is approximately 9–11 hours—meaning it takes 9–11 hours for half of the amphetamine to be eliminated from the plasma—much of the drug from the immediate release dosage form will still be present in the plasma when release and absorption of the drug from the delayed enteric release dosage form begins. (*See* Trial Ex. 31 at 27; PFF ¶ 286.) The drug from the delayed enteric release dosage form will therefore exhibit an *additive* effect, with it joining the drug remaining in the plasma from release of the IR Beads. (PFF ¶ 287.) This additive effect means that the plasma concentration will continue to increase until it reaches a second peak plasma concentration that exceeds the peak plasma concentration after the immediate release dosage form. (*Id.*)

This intuitive understanding of Abhai's ANDA Product is confirmed by comparing the plasma profile resulting from administration of just an immediate release dosage form of the same mixed amphetamine salts to the plasma profile resulting from administration of Abhai's ANDA Product. (*Compare* PTX J at 43–44 *with* Trial Ex. 75 at 30–55; *see* PFF ¶¶ 290−292.) The resulting comparison shows that the plasma concentration in the plasma profile for Abhai's

16

ANDA Product (blue curve) continues to rise beyond the peak plasma concentration from the immediate release-only dosage form (red curve):



(Maggio Opening, ¶ 132, Fig. A; *see generally* Maggio Opening ¶¶ 125–34, PTX W; PFF ¶ 293.) The *only* explanation for the rise in concentration after the peak plasma concentration achieved after release of the immediate release dosage form is the additional drug provided by the delayed enteric release dosage form; thus "the peak plasma concentration … reached after release of [the] delayed enteric release dosage form exceeds the peak plasma concentration previously reached after release of [the] immediate release dosage form." (*See* PFF ¶ 294−299.[6])

Because it cannot avoid infringement under the plain and ordinary understanding of the term "peak plasma concentration," Abhai attempts to interpret this claim language as requiring that each "peak plasma concentration" is followed by a declining concentration, even though the specification and prosecution history are clearly to the contrary.

Abhai's interpretation would exclude the plasma profile in Figure 7—which is described as being "similar to the desired target plasma level profile shown in Fig. 1," and is thus a

---

[6] That Abhai's ANDA Product meets this limitation is further illustrated by Dr. Maggio's use of a standard pharmacokinetic analysis, the Wagner-Nelson analysis, which calculates the percentage of drug absorbed as a function of time. (Maggio Opening ¶¶ 51–68, 120, PTX R, S, and T; Trial Ex. 83; PFF ¶¶ 306−314.)

preferred embodiment. The '148 Patent includes two plasma profiles (Figures 7 and 8) resulting from the administration of capsules containing immediate release and delayed release pellets prepared according to the Examples in the Patent:



FIG. 7          FIG. 8

(*See* Trial Ex. 2 at 14, 6:64–7:4, 12:39–47; *see* PFF ¶ 325.) Both are described as showing "general plasma profiles … similar to the desired target plasma level profile shown in Fig. 1," (Trial Ex. 2 at 12:47–48; PFF ¶ 325) which is itself described as "illustrat[ing] the desired target plasma level profile of the pharmaceutical active contained within the delivery system." (*Id.* at 3:37–39; PFF ¶ 321.) Because of the additive effect, Figure 7 unquestionably has a second peak plasma concentration after the delayed release that would exceed the peak plasma concentration after the immediate release. Interpreting the "peak plasma concentration" to exclude Figure 7 would exclude a preferred embodiment, an interpretation that "is rarely, if ever, correct." (*Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013); *see also* PFF ¶ 327.)

The prosecution history further underscores that excluding Figure 7 from the claims is improper, and Abhai's interpretation is incorrect. As the prosecution history explains, the pharmacokinetic values for area under the curve (AUC) and maximum concentration ($C_{max}$) found in Claims 1 and 2 were "taken directly from Figs. 7 and 8." (Trial Ex. 179 at 281; PFF ¶ 333.) This assertion—confirmed by Dr. Maggio, *see* Maggio Opening ¶¶ 76–78; PFF ¶ 335−338—reinforces that the claims encompass Figure 7.

Finally, Abhai's ANDA Product will meet the "peak plasma concentration" limitation irrespective of whether the Court interprets the limitation in accordance with the specification or prosecution history, or instead interprets it as Abhai proposes. This portion of the claim is directed to the pharmacokinetics of an individual "patient," rather than of some larger population. (*See* Trial Ex. 2 at 42–46 ("wherein said pharmaceutical formulation is sufficient to maintain an effective level … *in the patient* … and the peak plasma concentration") (emphasis added); *see also* PFF ¶¶ 349−351.) Most (54.2%, or 52 of 97) of the individuals in Abhai's Fasted, Fed, and Sprinkled bioequivalence studies[7] generated a plasma concentration profile with the precise shape (similar to Figure 8) that Abhai insists is required by the '148 Patent: 12 of the 28 subjects in the Fasted ANDA Study (42.9%); 21 of the 40 subjects in the Fed ANDA Study (52.5%), and 19 of the 28 subjects in Sprinkled ANDA Study (67.9%). (*See* Trial Exs. 71, 75, 82; *see also* Maggio Opening ¶ 136.)

Abhai does not—and cannot—dispute this fact. Instead, Abhai contends that the asserted claims are directed not to the individual "patient" recited in the claim, but to a patient "population," and then relies exclusively on mean curves—even though numerous individuals (52 *in toto*) that generated a plasma profile like Figure 8 clearly would constitute a "population." But to the extent there were any doubt that the claims are directed to individuals, the specification removes that doubt by providing in Figures 7 and 8 plasma profiles generated from individuals. (*See* Trial Ex. 2 at 14 (referring to the source of the profiles as "subject 3" and "subject 18"); *see also* PFF ¶ 323.)

---

[7]  The pharmacokinetics of healthy individuals, like those studied by Abhai, are the same as those of ADHD patients. (Maggio Opening ¶ 195; Bergstrom Dep. 175:6–13.)

Dr. Maggio also explains that relying exclusively on mean data is inappropriate due to inter-subject variability, which tends to obscure finer features in a plasma profile. (Maggio Opening ¶ 113.) He demonstrated this point conclusively by averaging plasma profiles of a collection of individuals who generate plasma profiles like Figure 8: when averaged, the shape that Abhai insists is required by the claims disappears. (Maggio Rebuttal ¶ 44; *see* PFF ¶ 359.)

### D.    Abhai's ANDA Product Meets the AUC Limitation.

The evidence will also show that Abhai's ANDA Product will meet the AUC limitation. The AUC limitation encompasses a range of AUC values, but modifies the high and low end of the range with the word "about." (PFF ¶ 373.) The prosecution history explains that "[t]he term 'about' has its usual meaning in the field, *e.g.*, roughly ± 20%, for example as used by FDA in its determinations of bioequivalency." (Trial Ex. 179 at 269; *see also* Trial Ex. 64 at 7 (as the ± 20% is expressed as a ratio of the test product to the reference product, FDA expresses it numerically as 80–125%); PFF ¶¶ 376−377.) Giving the definition in the prosecution history its effect results in a claimed AUC range corresponding to "about 467" to "about 714" of precisely 373.6 to 892.5 ng hr/ml. (Maggio Opening ¶¶ 80–81; PFF ¶¶ 378−381; *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) (observing that a patentee "can define (lexicography) . . . claim scope during prosecution").) Additionally, a POSA would understand from the patent specification and the prosecution history that the AUC recited in the claims refers to the AUC calculated from time zero to 48 hours ("$AUC_{0-48}$"). (PFF ¶¶ 384−385.) This is apparent from Figures 7 and 8 themselves, the source of the 467 and 714—which record data until 48 hours, *see* Trial Ex. 2 at 14—and from the calculations that Dr. Maggio performed, which conclusively demonstrate that the claimed numeric values derive from Figures 7 and 8 calculated as $AUC_{0-48}$. (Maggio Opening ¶¶ 76–78; PFF ¶ 387.)

The results of Abhai's three ANDA studies shows that Abhai's ANDA Product meets the AUC limitation by generating AUC of about 373.6 to 892.5 ng hr/ml, calculated from time zero to 48 hours:

| Study | Number of subjects with $AUC_{0\text{-}48}$ that satisfies the AUC claim limitation |
|-------|----------------------------------------------------------------|
| Fasted | 21/28 (75%) + mean AUC |
| Fed | 36/38 (94.7%) + mean AUC |
| Sprinkled | 26/28 (92.9%) + mean AUC |

Bound by the data from the studies it conducted, Abhai again seeks to develop a new construction of "about," ignoring (1) the prosecution history's definition (±20%) in favor of an unsupported interpretation of "about" as "simply permitting fractions to be rounded up or down so as to fall within the range," Bergstrom ¶ 61, and (2) the specification's guidance in Figures 7 and 8 that AUC refers to $AUC_{0\text{-}48}$ in favor of an interpretation of AUC as AUC calculated from time zero to infinity ($\infty$). (Bergstrom ¶ 37; *see also* Bergstrom Dep. 74:21–75:6 (explaining that he did not rely on any disclosure in the Patent to inform his understanding of "AUC").)[8]

Moreover, even under Abhai's tortured construction of the AUC limitation, Abhai's ANDA Product nonetheless produces a plasma profile in "human individual" after "human individual"—only one is required by the claims—no matter what scope is given to the "about" preceding the numbers in the AUC range and irrespective of how AUC is calculated:

---

[8] Not surprisingly, in contrast to the calculated $AUC_{0\text{-}48}$ values, the calculated $AUC_{0\text{-}\infty}$ for Figures 7 and 8 do not correspond to the values recited in the claims. (PFF ¶ 381.)

|  | Number of subjects demonstrating a plasma concentration versus time curve that meets the AUC limitation | | | |
|---|---|---|---|---|
|  | $AUC_{0-48}$ 373.6–892.5 ng hr/ml | $AUC_{0-48}$ 467–714 ng hr/ml | $AUC_{0-\infty}$ 373.6–892.5 ng hr/ml | $AUC_{0-\infty}$ 467–714 ng hr/ml |
| **Fasted** | 21/28 (75.0%) + mean AUC | 14/28 (50%) | 21/28 (75.0%) + mean AUC | 9/28 (32.1%) |
| **Fed** | 36/38 (94.7%) + mean AUC | 28/38 (73.7%) + mean AUC | 36/40 (90.0%) + mean AUC | 28/40 (70%) + mean AUC |
| **Sprinkled** | 26/28 (92.9%) + mean AUC | 20/28 (71.4%) + mean AUC | 23/28 (82.1%) + mean AUC | 15/28 (53.6%) + mean AUC |
| **Total** | 83/94 (88.3%) | 62/94 (66.0%) | 80/96 (83.3%) | 52/96 (54.2%) |

(Maggio Opening ¶¶143–146, 150–153; 196–97; PFF ¶ 395)

Faced with the overwhelming number of "human individuals" that produced an AUC within the claimed range—whether the ±20% definition is given effect or whether AUC is read as referring to $AUC_{0-48}$—Abhai contends that a POSA would understand "a human individual" to mean a "human patient population" with identical age and ethnic distribution to the population of patients prescribed ADDERALL XR or a generic equivalent. Abhai (again) offers no support for its interpretation from the specification or prosecution history.[9] In any event, as Abhai has relied on its ANDA studies to seek approval to market its ANDA Product to *all* ethnic groups and ages, Shire should be able to rely on the same studies to show that Abhai's ANDA Product meets the AUC limitation.

---

[9]  In fact, statements in Abhai's own ANDA filings demonstrate that Abhai views patients within different age brackets as *separate* populations. *See, e.g.*, Trial Ex. 31 at 9 (explaining dosing considerations for the child, adolescent, and adult populations separately).

### E.    Abhai's ANDA Product Meets the "about 22.5 to about 40 $C_{max}$" Limitation.

The evidence will further demonstrate that Abhai's ANDA Product will produce a plasma concentration versus time curve that "has a maximum concentration ($C_{max}$) of about 22.5 to about 40 ng/ml for about a total dose of 20 mg" in a human individual.[10]

As with the AUC limitation, the $C_{max}$ range in dependent Claim 2 is modified by the word "about," which the prosecution history defines to mean ± 20%. (Trial Ex. 179 at 281; PFF ¶¶ 413−414.) Accordingly, Abhai's ANDA Product meets this limitation if administration of its product results in a plasma profile with a $C_{max}$ that falls within the range of 18–50 ng/ml. (PFF ¶ 415.) An examination of Abhai's three ANDA studies reveals that Abhai's ANDA Product meets this limitation:

| Study | Number of subjects demonstrating a plasma concentration versus time curve that meets both the AUC and $C_{max}$ limitations |
|---|---|
| Fasted | 21/28 (75%) + mean AUC |
| Fed | 36/38 (94.7%) + mean AUC |
| Sprinkled | 24/28 (85.7%) + mean AUC |

(Maggio Opening ¶¶ 163−64, 198; *see also* PTX L; PTX M; PTX N; PFF ¶ 420.)

Rather than dispute that Abhai's ANDA Product meets the $C_{max}$ limitation, Abhai continues to adhere to its unsupported interpretations of the terms "about" and "individual." Notwithstanding Abhai's unduly restrictive claim interpretations, Abhai's ANDA Product still meets the $C_{max}$ limitation (as well as the AUC limitation of Claim 1, upon which Claim 2 depends), irrespective of what scope is given to "about," how AUC is understood, and whether

---

[10]  The peak plasma limitation is found in Claim 2, which depends from Claim 1. The limitations of Claim 2, and accordingly Claim 1, are incorporated into claim 10 from which asserted Claim 11 depends.

"human individual" is read as written or instead as a "population" for which only the mean can be considered:

| | Number of Subjects Demonstrating a Plasma Concentration Versus Time Curve That Meets Both the AUC and the $C_{max}$ Limitations | | | |
|---|---|---|---|---|
| | $AUC_{0\rightarrow48}$ 373.6–892.5 ng hr/ml  $C_{max}$ 18–50 ng/ml | $AUC_{0\rightarrow48}$ 467–714 ng hr/ml  $C_{max}$ 22.5–40 ng/ml | $AUC_{0\rightarrow\infty}$ 373.6–892.5 ng hr/ml  $C_{max}$ 18–50 ng/ml | $AUC_{0\rightarrow\infty}$ 467–714 ng hr/ml  $C_{max}$ 22.5–40 ng/ml |
| **Fasted** | 21/28 (75.0%) + mean $AUC/C_{max}$ | 10/28 (35.7%) | 21/28 (75.0%) + mean AUC | 6/28 (21.4%) |
| **Fed** | 36/38 (94.7%) + mean $AUC/C_{max}$ | 24/38 (63.2%) + mean $AUC/C_{max}$ | 36/40 (90.0%) + mean AUC | 26/40 (65.0%) + mean $AUC/C_{max}$ |
| **Sprinkled** | 24/28 (85.7%) + mean $AUC/C_{max}$ | 12/28 (42.9%) + mean $AUC/C_{max}$ | 23/28 (82.1%) + mean AUC | 11/28 (39.3%) + mean $AUC/C_{max}$ |
| **Total** | 81/94 (86.2%) | 46/94 (48.9%) | 80/96 (83.3%) | 43/96 (44.8%) |

(Maggio Opening ¶¶ 162–70, ¶¶ 198; *see also* PTX L; PTX M; PTX N; PFF ¶ 421.)

**F.    Abhai's ANDA Product Meets the "about 40 $C_{max}$" Limitation.**

The evidence will further demonstrate that Abhai's ANDA Product will meet the " about 40 $C_{max}$" limitation. (*See, e.g.*, Trial Ex. 2 at 13:56–58.)[11] As with the "AUC" and "about 22.5 to about 40 $C_{max}$" limitations discussed above, the "about" in the "about 40 $C_{max}$" limitation is defined by the prosecution history to mean ± 20%. (PFF ¶ 425.) Accordingly, Abhai's ANDA Product meets this limitation if administration of that product to an individual results in a $C_{max}$ within the range of 32–50 ng/ml. (PFF ¶¶ 426−428.) An examination of the data in Abhai's three ANDA studies reveals that Abhai's ANDA Product meets this limitation:

---

[11] This limitation is found in Claim 7, which ultimately depends from Claim 1. The limitations of Claim 7, and accordingly Claim 1, are incorporated into Claim 11 through Claim 10.

| | Number of subjects demonstrating a plasma concentration versus time curve that meets both the AUC and $C_{max}$ limitations | |
| --- | --- | --- |
| | $AUC_{0-48}$ 373.6–892.5 ng hr/ml $C_{max}$ 32–50 ng/ml | $AUC_{0-\infty}$ 373.6–892.5 ng hr/ml $C_{max}$ 32–50 ng/ml |
| **Fasted** | 19/28 (67.9%) + mean $AUC/C_{max}$ | 19/28 (67.9%) + mean AUC |
| **Fed** | 23/38 (60.5%) + mean $AUC/C_{max}$ | 21/40 (52.5%) + mean AUC |
| **Sprinkled** | 18/28 (64.3%) + mean $AUC/C_{max}$ | 16/28 (57.1%) + mean AUC |
| **Total** | 60/94 (63.8%) | 56/96 (58.3%) |

(Maggio Opening ¶¶ 186–92, 200; *see also* PTX L; PTX M; PTX N; PFF ¶ 428)

### G.    Abhai's ANDA Product Meets the "coating thickness" Limitation.

The evidence will also demonstrate that that the enteric coating on Abhai's DR Beads is "at least 25 μm" thick. (Trial Ex. 2 at 14:17–18, 46–47; PFF ¶¶ 435−457.) For each dosage strength of Abhai's ANDA Product, Dr. Luk measured the thickness of the enteric coating (the "DR Polymer layer") using Raman and optical microscopy. (Luk ¶ 57; PFF ¶¶ 444, 450.) His hundreds of measurements confirm that the enteric coating is much thicker than 25 μm: indeed, every single measurement exceeded 25 μm. (Luk ¶¶ 56–57; PTX H; PFF ¶ 457.) Abhai offers no substantive defense with regard to this element, and merely asserts that the testing was performed on samples that were several months past their expiration date. However, Abhai provides no evidence that coating thickness increases over time, or that the samples meaningfully differed in thickness from Abhai's ANDA product pre-expiry. Therefore, Abhai's unsupported argument is insufficient to undermine Dr. Luk's results.

### CONCLUSION

Judgment should be entered in Shire's favor.

**Dated:** March 23, 2017

Respectfully submitted,

_/s/ Eric J. Marandett_

Eric J. Marandett (BBO# 561730)
Margaret E. Ives (BBO# 668906)
Patrick S. Boyd (BBO# 688634)
**CHOATE HALL & STEWART LLP**
Two International Place
Boston, MA 02110
Tel: 617.248.4014
emarandett@choate.com
mives@choate.com
pboyd@choate.com

OF COUNSEL:
George F. Pappas
Jeffrey B. Elikan
Kevin B. Collins
Eric R. Sonnenschein
Erica N. Andersen
Alaina M. Whitt
David M. Parker
Miles L. Galbraith
**COVINGTON & BURLING LLP**
One CityCenter
850 10th St. NW
Washington, DC 20001
Tel: 202.662.6000
gpappas@cov.com
jelikan@cov.com
kcollins@cov.com
esonnenschein@cov.com
eandersen@cov.com
awhitt@cov.com
dparker@cov.com
mgalbraith@cov.com

Jennifer L. Robbins
**COVINGTON & BURLING LLP**
620 Eighth Avenue
New York, NY 10018
Tel: 212.841.1000
jrobbins@cov.com

Tess A. Hamilton
**COVINGTON & BURLING LLP**
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065-1418
Tel: 650.632.4719
tahamilton@cov.com

_Attorneys for Plaintiffs Shire LLC and Shire US Inc._

26

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and that paper copies will be sent to those non-registered participants (if any) on March 23, 2017.

Date: March 23, 2017

By: /s/ *Patrick S. Boyd*
Patrick S. Boyd

27