# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHIRE LLC and SHIRE US INC., <br><br> Plaintiffs, <br><br> v. <br><br> ABHAI, LLC, <br><br> Defendant. | Civil Action No. 1:15-CV-13909 (WGY) <br><br> Bench Trial |

## DECLARATION OF CARL C. PECK, M.D.

I, **CARL C. PECK**, declare and state as follows:

**I. EDUCATIONAL BACKGROUND AND QUALIFICATIONS**

1. I received my B.A. in 1963 from the University of Kansas, where I studied Mathematics and Chemistry. I then attended medical school at the University of Kansas Medical Center, where I received my M.D. degree in 1968.

2. From 1987 through 1993, I served as the Director of the Center for Drug Evaluation & Research (CDER) at the United States Food and Drug Administration (FDA).

3. In my role as Director of CDER, I was tasked with achieving the center's mission of ensuring the availability of safe and effective drugs. To accomplish this mission, I oversaw various activities directed at, among other things, evaluating drugs (both prescription and over the counter) before they received approval to be sold and

1

ensuring that drugs (both brand-name and generic) worked correctly and that health benefits outweighed known risks.

4. The Office of Generic Drugs (OGD) falls under the umbrella of CDER. OGD is responsible for reviewing ANDAs to facilitate the availability of safe, effective, and affordable generic medicines to the public. During part of my tenure in CDER, I also served as the Acting Director of OGD. Thus, while I served as Director of CDER, including my time as Acting Director of OGD, I personally reviewed many ANDAs and was directly responsible for overseeing the teams of FDA employees charged with reviewing ANDAs.

5. In addition, as Director of CDER and Acting Director of OGD, I was responsible for overhauling the generic drug approval process in the wake of the generic drug scandal in 1988.

6. In particular, I worked with OGD staff and the FDA Chief Counsel to implement new regulations aimed at preventing fraud in generic drug testing, including a new requirement for preservation of testing samples to enable FDA to check for manipulation of the samples to yield a biased comparison of the proposed generic and brand name products.

7. I also recruited experts from outside of FDA to replace poorly performing OGD staff and reorganized OGD to prevent vulnerabilities that came to light in the wake of the generic drug scandal. I then testified before Congress concerning these changes.

8. During 1994–2004, I was the founding Director of the Center for Drug Development Science (CDDS) at Georgetown University Medical Center. Since 2004, I have been a Partner and Chairman of NDA Partners (NDAP), a consulting firm that I founded that focuses on improving pharmaceutical and medical device development

practices. I also currently serve as an Adjunct Professor of Pharmaceutical Sciences in the Department of Bioengineering and Therapeutic Sciences at the University of California at San Francisco, Schools of Pharmacy and Medicine. I am a Visiting Professor at Peking University in Beijing, China.

9. In the course of my work at CDDS and NDAP, I have reviewed numerous FDA generic drug guidelines and confidential documents reflecting information exchanges between generic drug companies and FDA concerning FDA standards for approval of an ANDA or correction of standards-related FDA enforcement actions.

## II.   SCOPE OF DECLARATION

10. I have been asked by counsel for Plaintiffs Shire LLC and Shire US Inc. ("Shire") to provide my opinion on the status of an ANDA filed by Defendant Abhai, LLC ("Abhai"). I have also been asked to provide my opinion on the accuracy of Abhai's representations regarding the likely timing for approval of its generic drug product by FDA.

11. Counsel for Shire has provided me with the following documents, which I have reviewed and considered in providing my opinions stated herein:

    (a)    FDA's January 30, 2017 Complete Response Letter;

    (b)    FDA's March 29, 2017 Information Request;

    (c)    Abhai's March 29, 2017 Response to FDA's Information Request;

    (d)    FDA's April 14, 2017 Easily Correctable Deficiency;

    (e)    FDA's August 4, 2017 Complete Response Letter; and

    (f)    Abhai's August 10, 2017 Response to FDA's Complete Response Letter.

12. If called upon to testify regarding any of the opinions expressed herein, I reserve the right to rely on these documents, as well as (1) additional documents produced in this case; (2) deposition testimony and/or exhibits; (3) any expert declarations offered by Abhai; and (4) publicly available materials. I further reserve the right to prepare visual aids or demonstrative exhibits to summarize or support the opinions set forth below.

13. NDAP is being compensated at the rate of $650 per hour for my time spent in study and testimony in this matter and $250 per hour for any time spent traveling in connection with this matter. My compensation does not depend in any way on the opinions or conclusions that I express in this declaration or on the outcome of any aspect of this litigation.

### III. EXPLANATION OF FDA CORRESPONDENCE AND IMPACT ON APPROVAL TIMELINE

14. I understand that Abhai has filed an ANDA seeking to market a generic version of Shire's Adderall XR product. I further understand that, in its application, Abhai has requested approval of five dosage strengths: 10, 15, 20, 25, and 30 mg.

15. Abhai's ANDA has not yet received approval.

#### A. FDA Has Concluded That Abhai's ANDA Cannot Be Approved Until Abhai Repeats Its Bioequivalence Testing

16. FDA has concluded that Abhai's ANDA is not presently in a state for approval because of concerns relating to the bioequivalence testing of Abhai's ANDA Product.

17. FDA first communicated this conclusion in March 2017, via an Information Request in which FDA explained that it had recently conducted an inspection of the clinical site at which Abhai's in vivo bioequivalence (BE) studies were

4

performed, and found that "[s]amples of the test article, reference standard used in a bioequivalence study were not retained." Mar. 29, 2017 Information Request, ABHADD00132587 (Ex. 1). FDA further identified this issue as one that "could potentially compromise the integrity of the BE studies of the current ANDA." *Id.* FDA therefore requested a litany of supporting documents that could potentially prove the identity of the drug products tested as part of Abhai's BE studies.

18. In response, Abhai submitted shipping documentation for the test and reference products, along with e-mail correspondence explaining that all product had been retrieved by DEA investigators for destruction on May 7, 2015. Abhai Response to Information Request, ABHADD00123905–48 (Ex. 2).

19. Despite this response, FDA indicated that the documentation provided by Abhai was insufficient to cure the deficiencies. Apr. 14, 2017 Easily Correctable Deficiency, ABHADD00162400–01 (Ex. 3).

20. Thus, on August 4, 2017, FDA issued its second Complete Response Letter to Abhai advising Abhai that FDA "cannot approve this ANDA in its present form." Aug. 4, 2017 Complete Response Letter at 1 (ABHADD00162678) (Ex. 4). Specifically, FDA explained that Abhai "failed to meet the regulatory requirements for the retention of reserve samples for pivotal *in vivo* bioequivalence (BE) studies [21 CFR 320.38 and 320.63] of the current application." *Id.* at 2 (ABHADD00162679). In addition, FDA noted Abhai's failure "to provide the accountability record(s) for 1 unit of test product, 30 mg, (400 units shipped to the clinical site; 96 units used in the BE studies; 303 units retrieved by the DEA) and 2 units of the reference product, 30 mg, (400 units shipped to the clinical site; 96 units used in the BE studies; 302 units retrieved by the DEA) used in your pivotal *in vivo* BE studies. FDA further explained that "[i]n the absence of reserve

5

samples at the study site or an independent third party site, the authenticity of test and reference drug products used in the studies cannot be confirmed." *Id.*

21. Based on these deficiencies, FDA concluded that "the data from [Abhai's] pivotal *in vivo* fasting (AI1402), fed (AI1403), and sprinkle fasting (AI1404) BE studies are not acceptable." *Id.*

22. To remedy this failure, FDA directed Abhai to "repeat" each of these three BE studies "using unexpired batches of test and reference products" and to then retain sufficient quantities of the drug products, as required by regulation and FDA Guidance. *Id.*; *see also* 21 C.F.R. §§ 320.38, 320.63; CDER Guidance for Industry: Handling and Retention of BA and BE Testing Samples, https://www.fda.gov/downloads/Regulatory Information/Guidances/UCM126836.pdf (Ex. 5).

23. FDA further stated that Abhai's "response to this complete response letter will be considered a **MAJOR** AMENDMENT, given that the deficiencies have been classified as **MAJOR**." Aug. 4, 2017 Complete Response Letter at 3 (ABHADD00162718) (Ex. 4).

24. In response, on August 10, 2017, Abhai attempted to explain the discrepancy in capsule count. Abhai's Aug. 10, 2017 Resubmission (ABHADD00162698–702) (Ex. 6). More importantly, Abhai explained that DEA collected and destroyed the retained products because the Clinical Research Organization ("CRO") that performed the BE testing was under new ownership, and the new owner did not have a DEA registration. *Id.* at 7–11 (ABHADD00162703–07). According to Abhai, the CRO then had the obligation to secure alternative storage arrangements for the retained product. *Id.* at 8 (ABHADD00162704) ("Retention of the drug product at the study site or an independent third party organization is a

6

responsibility of Clinical Research Organization and not of the study sponsor."). But, the CRO did not secure alternative storage; Abhai was also unable to find a storage option. *Id.* at 10 (ABHADD00162706). Consequently, because alternative storage had not been arranged, DEA seized and destroyed the retained product samples. *Id.* at 11 (ABHADD00162707).

25. With this explanation, Abhai asked FDA to "review the totality of the circumstances in this highly unusual case" and waive the product retention requirement, and instead accept the documentation previously provided to—and rejected by—FDA regarding the chain of custody. *Id.* at 11 (ABHADD00162707). To be clear, this is the same documentation that Abhai submitted to FDA nearly five months before, in response to FDA's initial information request on the BE issue.

### B. Abhai Is Highly Unlikely to Succeed in Persuading FDA to Waive this Retain Requirement

26. I understand from counsel that Abhai continues to believe that it will convince FDA to reverse course and accept this documentation in lieu of the requirement that samples of the drug products used in the BE testing be retained. I do not share Abhai's optimism. As explained below, FDA is unlikely to waive the requirement that reserve samples be retained and remain available for inspection to confirm the reliability of BE testing results.

27. FDA's regulations require that the applicant or contract research organization (CRO) (if one was used) "retain reserve samples of any test article and reference standard used in conducting an in vivo or in vitro bioequivalence study required for approval of the" ANDA. 21 C.F.R. § 320.63. Such samples must be retained in accordance with a sample retention regulation that applies to bioavailability testing,

which requires, among other things, that samples be retained for at least five years. 21 C.F.R. § 320.38.

28. FDA implemented this sample retention requirement in the wake of the generic drug scandal, when, "in several instances, an applicant used disguised innovators' products rather than its own proposed product as the test products in certain bioequivalence studies." FDA, Retention of Bioavailability and Bioequivalence Testing Samples, 55 Fed. Reg. 47,034, 47,034 (interim rule Nov. 8, 1990). The sample retention requirement was intended to enable FDA to investigate suspected fraud, and also to help the agency evaluate "documented reports of drug product therapeutic failure and other adverse drug reactions attributed to the substitution of one drug product for another when the two products have been rated therapeutically equivalent, including reports of no drug effect and reports of toxicity." *Id.* In either case, "FDA may need to perform in its own laboratories assays or bioequivalence testing with samples of the proposed drug product and of the reference standard used in a bioavailability or bioequivalence study." *Id.* at 47,035. Consequently, this requirement is a cornerstone of the safeguards put in place to avoid future misconduct in the generic drug approval process.

29. Consistent with this importance in the approval process, FDA has explicitly stated its unwillingness to waive this sample retention requirement. Specifically, in the preamble to the final rule, FDA responded to a comment asking whether FDA would waive the requirement that a specified quantity of samples be retained "if sufficient quantities of a drug product were not available due to production restrictions such as high product costs or high potency compounds." FDA, Retention of

Bioavailability and Bioequivalence Testing Samples, 58 Fed. Reg. 25,918, 25,923 (Apr. 28, 1993). FDA rejected the possibility of a waiver, explaining:

> The agency does not intend to grant waivers from the requirements of this rule. FDA must be assured that the bioavailability and bioequivalence results upon which FDA bases approval are reliable. Therefore, samples of the products used to conduct the types of bioavailability and bioequivalence studies described in this rule must be available for FDA's analysis.

*Id.*

30. I understand from reviewing Abhai's August 10, 2017 Response to FDA that Abhai seeks to persuade FDA to nevertheless waive this requirement by placing the blame on the CRO. In particular, Abhai cites to FDA guidance requiring that the CRO retain the samples, rather than drug manufacturer. *See* Abhai's Aug. 10, 2017 Resubmission at 7–8 (ABHADD00162703–04) (Ex. 6) (citing CDER Guidance for Industry, *Handling and Retention of BA and BE Testing Samples* (May 2004) ("*CDER Guidance*") (Ex. 5)). Abhai is misreading this guidance.

31. Although the regulation and applicable guidance require the CRO (if used), rather than the applicant, to retain the reserve samples or transfer them to an independent third party, that provision *does not insulate the applicant from the consequences* of any failure by the CRO or third party to fulfill the sample retention requirement. *See* 21 C.F.R. § 320.38(a) & (h)-(i); 21 C.F.R. § 320.63; *CDER* Guidance, at 5 (Ex. 5). Indeed, a CRO's "refus[al] to submit reserve samples of the drug products used in the study when requested by FDA" is a basis for FDA to refuse to approve an ANDA or to withdraw approval of an ANDA. 21 C.F.R. §§ 314.127(b) & 314.150(b)(9). Further, as FDA has explained, "when an applicant or testing facility fails to retain samples or to release those samples to FDA . . . FDA may have insufficient information to conclude

that the study supporting the application reliably demonstrates bioequivalence or bioavailability." 55 Fed. Reg. at 47,036.

32. Thus, neither this Guidance, nor the regulations cited therein, transfer the consequences of failing to fulfill the sample retention requirement to the CRO. As such, Abhai is not shielded from the consequences of the failure to abide by this requirement. Rather than pass the blame, this Guidance, consistent with the purposes of the sample retention regulations, furthers the important goal of "eliminat[ing] the possibility of sample substitution by the study sponsor and/or drug manufacturer, or prevent the alteration of any reserve samples from a study conducted by a contractor before release of drug product samples to the FDA." CDER Guidance at 2 (Ex. 5).

33. I also note that, in its August 10, 2017 Response to FDA's Complete Response Letter, Abhai has essentially regurgitated the same explanation and supporting documents that it previously submitted to FDA in March 2017. FDA has already rejected this explanation and Abhai's attempt to place the blame on the CRO in an effort to evade the sample retention requirement. In my experience, when an ANDA applicant fails to provide new information in response to a negative FDA decision, FDA has a long history of refusing to reverse its conclusions.

34. For these reasons, it is highly unlikely that Abhai will be successful in its attempts to persuade FDA to waive the sample retention requirement and approve the ANDA in its current form.

### C. Because FDA Is Unlikely to Reverse Course, Abhai Is Unlikely to Receive Approval Until Mid to Late 2018, at the Earliest.

35. As explained above, FDA has insisted—and will likely continue to insist—that Abhai repeat the three BE studies, using unexpired batches of the test and reference drug products.

36. But, I understand from counsel that Abhai currently is not in possession of any product that has not expired. Thus, before Abhai can perform the required new BE studies on non-expired product, Abhai must first manufacture new batches of its ANDA Product.

37. I further understand from counsel that it took Abhai 1 week to manufacture the ANDA batches. In addition to the one-week manufacturing time, Abhai will likely need to dedicate several weeks to preparing for the manufacture of the new batches of product. For example, Abhai will likely need to invest time in procuring the active pharmaceutical ingredient (a controlled substance), mobilizing components, scheduling machinery, and assigning staff. I am further informed that the original BE testing took at least two and a half months to complete the study, compile the data, and finalize the clinical study report. Thus, the results of the new BE studies will not be ready for submission to FDA for at least three months after Abhai begins manufacturing the new batches. Even if Abhai were to begin manufacturing new batches now, the submission would not be ready until approximately December 2017, at the earliest.

38. Even after Abhai submits an ANDA amendment to FDA containing the results of the new BE studies, it will take time for FDA to review the amendment. As noted above, FDA has classified this type of amendment as a "major amendment." *See* Aug. 4, 2017 Complete Response Letter at 3 (ABHADD00162718) (Ex. 4); *see also* FDA,

11

Draft Guidance for Industry, *ANDA Submissions—Amendments and Easily Correctable Deficiencies Under GDUFA*, at 4 (July 2014) (Ex. 7), https://www.fda.gov/downloads/ Drugs/Guidances/UCM404440.pdf (providing that ANDA amendments containing new bioequivalence studies are classified as major amendments).

39. According to FDA's draft guidance, "[m]ajor amendments contain a substantial amount of new data or new information not previously submitted to or reviewed by FDA, requiring, in FDA's judgment, a substantial expenditure of FDA resources. In general, the type quantity, or complexity of data contained in a major amendment requires a lengthy review by FDA, and consults from other divisions or offices may be required to complete the review." *Id.*

40. According to FDA's performance goals that are part of the Generic Drug User Fee Amendments of 2012 (GDUFA), a first major amendment is eligible for a specific review period (specifically, 10 months). *Id.* at 3. However, Abhai's ANDA was filed in June 2014, prior to the effective date of these performance goals. *Id.* at 2 (explaining that "[t]he performance goals do ***not*** apply to amendments submitted on or after October 1, 2014, if they amend original ANDAs . . . submitted before October 1, 2014"). Accordingly, FDA would not be subject to a GDUFA goal date by which to take action on the submission.

41. Moreover, Abhai's ANDA amendment does not appear to meet any of the criteria for expedited review pursuant to the OGD policy entitled "Prioritization of the Review of Original ANDAs, Amendments, and Supplements." FDA, CDER, Manual of Policies and Procedures (MAPP) 5240.3 (Rev. 3, June 27, 2017). Under that policy, "[s]ubmissions that do not receive expedited review will be reviewed in the order in

which they are received, to the extent possible and unless otherwise determined by the Agency." *Id.* at 3.

42. In the absence of any applicable GDUFA goal date or eligibility for expedited review, I expect that it will take at least six months, and potentially up to ten months, for FDA to complete its review of a major amendment submitted by Abhai containing the results of new BE studies, and for FDA to take action on that submission. This estimate includes the amount of time that will elapse between the time of submission and the time that OGD will begin its review of the ANDA amendment.

43. Accordingly, I do not expect FDA to take action on an ANDA amendment containing new BE data for a total of ten to fourteen months from the time when Abhai begins to manufacture new batches. Therefore, Abhai is unlikely to receive FDA's response to such an ANDA amendment until sometime between June 2018 and October 2018.

44. The action that FDA takes on Abhai's ANDA amendment will not necessarily be an approval. If FDA identifies deficiencies in Abhai's new BE data or in other components of the application, FDA could issue another complete response letter rather than approve the ANDA.

### D. As Part of Repeating BE Testing, Abhai Must Also Perform Dissolution Testing on the New Batches

45. I have also been asked to explain the dissolution testing that Abhai will be required to conduct as a result of FDA's directive that Abhai manufacture new batches of ANDA Product and repeat the BE testing before the ANDA can be approved.

46. If *in vivo* BE is demonstrated in a specified strength (usually the highest strength), FDA generally waives a requirement of *in vivo* BE testing in other strengths,

13

provided that certain conditions are met. *See* FDA, Guidance for Industry, *Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted Under an ANDA*, at 11 (Dec. 2013) (Ex. 8), https://www.fda.gov/downloads/drugs/guidances/ucm377465.pdf.

47. For proposed ANDA products that reference Adderall XR, FDA will waive in vivo BE testing of all strengths other than the 30 mg dosage strength—the highest dosage strength of Abhai's ANDA Product—based on "(i) acceptable bioequivalence studies on the [30 mg] strength, (ii) acceptable dissolution testing across all strengths, and (iii) proportional similarity in the formulations across all strengths." FDA, *Draft Guidance on Amphetamine Aspartate; Amphetamine Sulfate; Dextroamphetamine Saccharate; Dextroamphetamine Sulfate*, at 2 (Sept. 2012) (Ex. 9), https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm082244.pdf. Accordingly, to be eligible for this waiver of *in vivo* BE testing in strengths other than 30 mg, Abhai will need to conduct "acceptable dissolution testing across all strengths." *Id.*

48. Importantly, to satisfy the requirements of the waiver process, Abhai should manufacture new batches of each of the five proposed dosage strength of its ANDA Product. Without these new batches, Abhai will be unable to show the required "acceptable dissolution testing across all strengths" and "proportional similarity in the formulations across all strengths" in relation to the BE testing to be performed on the newly manufactured, unexpired 30 mg product. *See id.*

49. This waiver process will therefore require that Abhai perform dissolution testing on all strengths of the unexpired batches of its ANDA Product.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.


San Luis Obispo, CA
Dated: August 17, 2017

By_ *[signature: Carl C. Peck]*
_____
Dr. Carl C. Peck, M.D.